# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No. 23 M 678
INFORMATION ASSOCIATED WITH THE FACEBOOK ACCOUNT )
https://www.facebook.com/Mz.CrazyLoc THAT IS STORED AT )
PREMISES CONTROLLED BY META PLATFORMS, INC. )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of a controlled substance |

The application is based on these facts:
See Affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.*

BMD'A  09/19/23 at 1529
*Applicant's signature*

Brian D'Arcy FBI SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____
*(specify reliable electronic means).*

Date: 9/19/2023

*Judge's signature*

City and state: Green Bay, Wisconsin

Honorable Magistrate Judge Sickel
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE FACEBOOK ACCOUNT https://www.facebook.com/Mz.CrazyLoc THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | Case No. 23-m-678<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Brian D'Arcy, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been employed as such since July 2017. Upon graduation from the FBI Academy in Quantico, Virginia, I was assigned to the Milwaukee Division, Green Bay Resident Agency. Since arriving in Green Bay, I have been assigned to work on various criminal violations, to include fraud, child pornography, armed robberies, drug trafficking, and crimes occurring on Native American reservations. I have experience in conducting criminal investigations involving suspects using electronic communications to orchestrate criminal activity. I have assisted in the execution of search warrants for the purpose of obtaining documents relating to various criminal activity. As a Special Agent of the FBI, I am authorized to investigate violations of the criminal

laws of the United States, and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

3. The facts in this affidavit come from other law enforcement officers and witnesses, my personal observations, and my training and experience. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841(a)(1) have been committed by the user of the Facebook account https://www.facebook.com/Mz.CrazyLoc. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5. On March 24, 2023, at approximately 11:51 PM, officers with the Menominee Tribal Police Department (METPD) responded to a report of an unresponsive female at N3654 3rd Avenue, Neopit, WI 54150. Officers administered CPR and two doses of Narcan to the victim, who was laying on the ground in the driveway of the residence, until emergency services arrived. The victim was identified as Michelle M. Kelley. While on scene, an individual by the name of Aleta A. Wescott told officers that Kelley had been smoking "downers" recently. Based on my training and experience, I am aware that the term "downers" is often used to refer to some form of depressant or opiate. METPD Officer Sosaeh Waukechon spoke with Wescott, who said that she was riding around with Michelle Kelley, who was driving. They stopped up on the hill where Wescott said Holly Corn lives. Wescott said that two males were smoking something with Kelley. Wescott said that she did not know who the two males were. They then left the driveway and Kelley, who was driving, began to drive into the curb on the side of the road while coming down the hill. Wescott told Kelley to pull over and she went around to switch seats to drive. However, when she reached the driver's side, Kelley had become unresponsive. Wescott had to push Kelley into the passenger side of the vehicle and then drove to N3654, where she could use her phone because she could only place a call using the internet.

2

6. On March 27, 2023, METPD Detective Joshua Lawe interviewed Aleta Wescott regarding the incident. Wescott told Detective Lawe that she was with Michelle Kelley in her vehicle drinking. They left Kelley's house and went to the Redkettle's residence. Kelley told Wescott that they were going "by them guys." Wescott did not know who Kelley was referencing by the phrase "them guys" at the time. When they pulled into the driveway, two girls came out and walked away. Following this, two males came to the car from inside of the house. Wescott said that the two males were Richard "Amos" Corn and Austin Waupoose. Kelley told both males to get into the vehicle and lifted the seat to allow them into the back seat area of the car. Wescott said they then began to smoke and she had to put her hand over her face to block the smoke. Wescott said that she asked them to smoke outside of the car.

7. Wescott told Detective Lawe that they then left the residence and drove up the road to another house. Wescott described the house as a two-story residence on top of the hill. Detective Lawe was familiar with this residence, N3421 Cottage Avenue in Neopit, as belonging to Amos Corn's mother. Once they pulled into the driveway, they all began to smoke again. According to Wescott, Kelley wanted to stay in the driveway of N3421 Cottage Avenue for a few more minutes after they had finished smoking. Kelley then backed out of the driveway and began to drive down "White City Hill," which Detective Lawe knows as Cottage Avenue. Wescott said that the car began hitting the snowbank on the right side of the rode. Wescott looked over and saw Kelley slumped over and unresponsive. Wescott said that they were going fast and she had to jam the car into park to get them to stop. Wescott had to put Kelley into the passenger seat of the car so she could drive. Wescott then drove to Michelle's residence where they called for an ambulance.

8. Wescott told Detective Lawe that it was Kelley's idea to go to the Redkettle residence. Kelley said that she wanted to go to the residence for "that stuff." Wescott knew Kelley to smoke heroin. When they pulled into the driveway of the Redkettle residence, they were only there for a few minutes before Amos Corn and Austin Waupoose came out. They smoked in the car while in the driveway for approximately five to ten minutes. According to Wescott, Corn took the drugs out and shared them with Kelley and Waupoose. Wescott observed Kelley smoking the drugs while in the car. Wescott stated that

3

she saw Corn with the tinfoil and watched him open it up. When Corn and Waupoose came out of the house, they asked Kelley if she wanted to smoke. Kelley then responded, yeah, bail in. Wescott said that she knew who Corn was, but did not really know him.

9. When they left the Redkettle residence, they pulled into N3421 Cottage Avenue, where Corn and Waupoose exited the vehicle at some point. Kelley told Wescott that they were going to stay in the driveway for a few minutes. A short time later, Kelley pulled out of the driveway and began to drive down the hill at a high rate of speed and then went unresponsive.

10. On April 5, 2023, Detective Lawe conducted a follow-up interview with Wescott. Wescott was asked how she was able to identify Amos Corn and Austin Waupoose, as she had originally told officers that she did not know who the two men were. Wescott said that she asked people, specifically the Redkettles and Corns, who the men were. Wescott said that she had seen Corn and Waupoose before, but did not know their names until she was told by people what their names were. Wescott said that if she saw photos of Corn and Waupoose, she would be able to identify them. Detective Lawe showed Wescott a mugshot of an individual and asked her to identify the person. Wescott identified the individual in the photo as Amos Corn. Wescott said that on the night of the incident, Corn was in the car with her and Kelley and had curly hair. Wescott verified that Corn had the tinfoil of drugs and was sitting near the middle with Waupoose sitting on the left. Wescott was also shown a mugshot of Waupoose, who Wescott identified as such. Wescott said that Waupoose was in the vehicle with her and Michelle.

11. On March 28, 2023, Detective Lawe interviewed Austin Waupoose at the Menominee Tribal Police Department. After being advised of and waiving his Miranda rights, Waupoose stated that he was walking through White City when Michelle Kelley pulled up next to him on the road to say hello. I know White City to be the Cottage Avenue area in Neopit. After a short conversation, Kelley asked Waupoose if he wanted a drink of her beer, which he took a drink of. Waupoose said that he was by himself. Kelley was with her friend in the car, who Waupoose did not know. Kelley was driving the vehicle. When questioned about his explanation of events compared to the statements made by Aleta Wescott, Waupoose denied Wescott's version of events.

4

Case 1:23-mj-00678-JRS    Filed 09/19/23    Page 5 of 19    Document 1

12. On April 6, 2023, Detective Lawe interviewed Yolanda Webster, who he knew to use drugs with Corn and to share a child with Corn. When asked what she knew about Michelle Kelley's death, Webster said that there was a recording on Facebook about the incident that Corn made. Corn allegedly sent an audio message in which Corn stated that Kelley was looking for a type of drug that he did not have it, so he gave Kelley "up." Based on my training and experience, I am aware that the term "up" can refer to a stimulant such as Methamphetamine. A friend of Webster showed her this Facebook message. Webster was unwilling to provide the name of the friend to Detective Lawe. When Webster asked Corn what happened, he told Webster that Kelley left and did not want the "up." Kelley then went and traded the "up" to an individual by the name of Talon for some "down." Webster said that Amos did not sell drugs but used them. Webster believed that Kelley would go up to Corn's residence to ask where to find drugs.

13. On June 26, 2023, Detective Lawe attempted to interview Amos Corn at the Shawano County Jail. Corn refused to speak with Detective Lawe.

14. On April 20, 2023, a toxicology report by NMS Labs was issued to the Menominee County Medical Examiner's Office for specimens belonging to Michelle Kelley. The report listed the following positive findings:

**Positive Findings:**

| Analyte | Result | Units | Matrix Source |
|---|---|---|---|
| Ethanol | 120 | mg/dL | 001 - Subclavian Blood |
| Blood Alcohol Concentration (BAC) | 0.120 | g/100 mL | 001 - Subclavian Blood |
| Caffeine | Presump Pos | mcg/mL | 001 - Subclavian Blood |
| Cotinine | Presump Pos | ng/mL | 001 - Subclavian Blood |
| Naloxone | Presump Pos | ng/mL | 001 - Subclavian Blood |
| Benzoylecgonine | 100 | ng/mL | 001 - Subclavian Blood |
| Diphenhydramine | 100 | ng/mL | 001 - Subclavian Blood |
| Amphetamine | 71 | ng/mL | 001 - Subclavian Blood |
| Methamphetamine | 690 | ng/mL | 001 - Subclavian Blood |
| Fentanyl | 4.8 | ng/mL | 001 - Subclavian Blood |
| 4-ANPP | 0.21 | ng/mL | 001 - Subclavian Blood |

See Detailed Findings section for additional information

15. Based on my training and experience, these findings suggest that levels of Methamphetamine and Fentanyl were present in Michelle Kelley's body at the time of her death. Additionally, according to an autopsy report provided by the University of Wisconsin Health - Anatomic

Pathology Laboratory, Kelley's cause of death was listed as, "Mixed drug toxicity/overdose (fentanyl and methamphetamine) with evidence of recent cocaine use."

16. On August 8, 2023, I met with the mother of Michelle Kelley, Jacquelin Kelley, at her residence in Neopit. Jacquelin located Michelle Kelley's Facebook page on her phone, which was listed as https://www.facebook.com/Mz.CrazyLoc. The profile name is listed as Michelle Kelley and the profile contains a photo of Michelle Kelley.

17. Based on my experience working on the Menominee Indian Reservation, I am aware that Facebook and Facebook Messenger are a common way for individuals that are part of the Menominee Nation community to communicate with one another. I am also aware that this platform can be used by members of the community to discuss illegal narcotics transactions. I believe that Michelle Kelley may have used Facebook to communicate with Amos Corn, Austin Waupoose, or other individuals to obtain a controlled substance prior to her death. When officers responded to the report of an unconscious female, they did not recover a cell phone belonging to Kelley. Since the incident, Kelley's phone has not been located.

18. Given this information and the events described in this affidavit, I believe that obtaining an order such as that described in this search warrant application to receive the information described in Attachments A and B would assist law enforcement in determining if Michelle Kelley communicated with Amos Corn, Austin Waupoose, or any other individuals over Facebook on the night of her death. This information would potentially help to corroborate the statement provided by Aleta Wescott and potentially assist with determining the exact source of the controlled substance that is believed to have caused Kelley's death. The potential existence of location data associated with the Facebook account may also assist investigators in corroborating or disproving information learned during the course of the investigation. A preservation request was sent to Facebook for the account on August 9, 2023 under case number 8015118. I am requesting records two weeks prior to and two days after Kelley's death in the event that other illegal narcotics transactions were facilitated via Facebook Messenger between Kelley, Corn, Waupoose, or other individuals, or other messages concerning her death were sent.

19. I am aware that Michelle Kelley was a Native American Indian. Federal jurisdiction for an investigation into her death attaches through that status and because the locations described above are within the exterior boundaries of the Menominee Indian Reservation in the Eastern District of Wisconsin.

## BACKGROUND CONCERNING FACEBOOK[1]

20. Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

21. Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

22. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

---

[1] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

7

23. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

24. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

25. Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

26. Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

27. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

28. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

29. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

30. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

31. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

32. In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about the user's access or use of that application may appear on the user's profile page.

33. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

34. Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

35. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

36. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example,

information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

37. Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

38. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

39. Based on the foregoing, I request that the Court issue the proposed search warrant.

40. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

41. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## REQUEST FOR SEALING

42.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

_B M. D'A__  09/19/23 at 1529_
Brian D'Arcy
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on __9/19/23__, 2023.

_____
HON. JAMES R. SICKEL
United States Magistrate Judge
Eastern District of Wisconsin

12

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with the Facebook account **https://www.facebook.com/Mz.CrazyLoc** that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

# ATTACHMENT B

## Particular Things to be Seized

I.  **Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a) All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities from **March 10, 2023 to March 26, 2023**;

(c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from **March 10, 2023 to March 26, 2023**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d) All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers;

future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, advertising ID, and user agent string;

(f) All other records and contents of communications and messages made or received by the user from **March 10, 2023 to March 26, 2023**, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g) All "check ins" and other location information;

(h) All IP logs, including all records of the IP addresses that logged into the account;

(i) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j) All information about the Facebook pages that the account is or was a "fan" of;

(k) All past and present lists of friends created by the account;

(l) All records of Facebook searches performed by the account from **March 10, 2023 to March 26, 2023**;

(m) All information about the user's access and use of Facebook Marketplace;

(n) The types of service utilized by the user;

(o) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

2

(p)   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)   Records of any Facebook accounts that are linked to the account by machine cookies (meaning all Facebook user IDs that logged into Facebook by the same machine as the account); and

(r)   All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government **within 14 days** of issuance of this warrant.

## II.   Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. § 841(a)(1) involving Michelle Kelley, Richard "Amos" Corn, Austin Waupoose, and others as yet unknown between **March 10, 2023 to March 26, 2023,** including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)   The sale of illegal drugs;

(b)   Communications between Michelle Kelley, Richard "Amos" Corn, Austin Waupoose, and others as yet unknown;

(c)   The overdose death of Michelle Kelley;

(d)   Actions taken to conceal the death of Michelle Kelley or the sale of illegal drugs to Michelle Kelley;

3

(e) Messages, photographs, videos, memes, status updates, comments, or other postings or communications

(f) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(g) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(h) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

4

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Meta Platforms, Inc. ("Meta"), and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Meta. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Meta, and they were made by Meta as a regular practice; and

    b.    such records were generated by Meta's electronic process or system that produces an accurate result, to wit:

        1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Meta in a manner to ensure that they are true duplicates of the original records; and

        2.    the process or system is regularly verified by Meta, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____

Date                                Signature